**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| PROCOMM INTERNATIONAL PTE. LTD.,<br><br>*Plaintiff*,<br><br>v.<br><br>VERIZON COMMUNICATIONS, INC., CELLCO PARTNERSHIP D/B/A VERIZON, WIRELESS, TELEFONAKTIEBOLAGET LM ERICSSON, and ERICSSON INC.,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 2:24-CV-0009-RWS-RSP |

**CLAIM CONSTRUCTION ORDER**

Before the Court is the opening claim construction brief of Procomm International Pte. Ltd. ("Plaintiff") (Dkt. No. 48, filed on March 4, 2025), the response of Defendants Verizon Communications, Inc., et al. ("Defendant" or "Defendants") (Dkt. No. 54, filed on March 18, 2025), and the reply of Plaintiff (Dkt. No. 59, filed on April 1, 2025). The Court held a claim construction hearing on April 22, 2025. Having considered the arguments and evidence presented by the parties at the hearing and in their claim construction briefing, the Court issues this Claim Construction Order.

# Table of Contents

**I. BACKGROUND** .......... **3**
**II. LEGAL PRINCIPLES** .......... **4**
**III. CONSTRUCTION OF AGREED TERMS** .......... **8**
**IV. CONSTRUCTION OF DISPUTED TERMS** .......... **8**
A. "each remote wireless communication station having a co-located network layer router" .......... 8
B. "uplink RF sampled data" .......... 13
**V. CONCLUSION** .......... **17**

## I. BACKGROUND

Plaintiff brings suit alleging infringement of various U.S. patents, two of which involve the claim construction disputes presented to the Court: U.S. Patent No. 8,583,100 (the '100 patent) and 7,724,521 (the '521 patent). For the claim construction briefing, the parties presented two disputed terms in the '100 patent and two disputed terms in the '521 patent. As discussed below, the parties have agreed to the meaning of the two disputed terms in the '521 patent. This opinion addresses the remaining two disputed terms in the '100 patent.

In general, the '100 patent describes a distributed base station system, and methods and systems for transmitting wireless communication signals and data including a plurality of remote stations, transmitting/receiving RF signals via antennas of the remote stations, and sending transport signals through a network of remote wireless base stations. The Abstract of the '100 patent is reproduced below:

> A distributed base station system for high speed data transmission is disclosed. The system includes a plurality of remote antennas, each antenna being coupled to a router. The plurality of remote antennas is coupled to each other and is arranged into a network.

Claim 15 of the '100 patent is exemplary and is reproduced below:

> A method of transmitting a wireless communication signal comprising:
>
> receiving a first RF signal at an antenna of a first remote wireless communication station;
>
> processing the first RF signal by a base station at the first remote wireless communication station;
>
> generating a second RF signal and a first transport signal representing a duplicate of the second RF signal at the first remote wireless communication station;
>
> transmitting the second RF signal from the antenna at the first remote wireless communication station;

routing the first transport signal through a network of remote wireless communication stations to a second remote wireless communication station, each remote wireless communication station having a co-located, network layer router;

transmitting a duplicate of the second RF signal based on the first transport signal from the antenna of the second remote wireless communication station;

receiving a third RF signal at the first remote wireless communication station; and

sending a second transport signal to a host unit based on the second RF signal.

## II. LEGAL PRINCIPLES

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Phillips*, 415 F.3d 1303 at 1312 (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court first examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims themselves, the specification and the prosecution history. *Phillips*, 415 F.3d at 1312–13; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004). The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *see also Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.").

"The claim construction inquiry. . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.' " *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.' " *Id*. (quoting *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc*., 242 F.3d 1337, 1343–44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp*., 383 F.3d 1295, 1301 (Fed. Cir. 2004).

"Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence is useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862) (internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and

determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not useful. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

**B. Departing from the Ordinary Meaning of a Claim Term**

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). "The standards for finding lexicography or disavowal are 'exacting.' " *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction,

representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## III. CONSTRUCTION OF AGREED TERMS

The parties agreed to the following construction of the term "Venturi effect" in the '521 patent: "The lowering of a fluid's (gas or liquid) pressure and rising of the fluid's speed as it moves through a flow constriction." *See* Joint Claim Construction Chart, Dkt. No. 43.

At the *Markman* hearing, the parties agreed to the following constructions:

| TERM | AGREED CONSTRUCTION |
|---|---|
| "convective opening" ('521 Patent, claim 14) | "open void that promotes natural convection heat transfer" |
| "a sealed environment" ('521 Patent, claim 14) | "a sealed environment that does not need to be weatherproof" |

Accordingly, the Court adopts the constructions agreed to by the parties as listed above.

## IV. CONSTRUCTION OF DISPUTED TERMS

The Court's analysis as to the disputed terms within the claims of the patents-in-suit are presented below.

### A. "each remote wireless communication station having a co-located network layer router"

| <u>Disputed Term</u> | <u>Plaintiff's Proposed Construction</u> | <u>Defendant's Proposed Construction</u> |
|---|---|---|
| "each remote wireless communication station having a co-located network layer router" ('100 Patent, claim 15) | Plain and ordinary meaning. | Plain and ordinary meaning – "each remote wireless communication station having its own separate co-located network layer router" |

The parties dispute whether this term has its plain and ordinary meaning, and more particularly, dispute the plain and ordinary meaning of the term "each" and "co-located."

Plaintiff argues that the term should be given its plain and ordinary meaning. *See, e.g.*, Dkt. No. 48, Plaintiff's Opening Claim Construction Brief, at 4-7. Plaintiff argues that there is no disclaimer or limitation in scope in the specification as to the term. *Id.*

Defendant argues that "each remote … station having a … router," in the context of the claim means exactly what both a layperson and a person of ordinary skill in the art would understand this language to mean in everyday usage – of the two or more remote stations in the "network," each station has its own separate router. *See, e.g.*, Dkt. No. 54, Defendant's Responsive Claim Construction Brief, at 5-11. Defendant argues that nothing in the intrinsic record suggests that a single router can be shared by the plurality of remote stations. *Id.* at 8. Defendant also argues that the prosecution history confirms its construction that "co-located" requires each network router to be in the same location as the corresponding remote location. *Id.* at 8-10.

In its Reply, Plaintiff argues that nothing in the claims or the intrinsic record requires each wireless station to have its own separate co-located network layer router. *See, e.g.*, Dkt. No. 59, Plaintiff's Reply Claim Construction Brief, at 1-4. Plaintiff argues that the invention supports a co-located router that is shared between multiple wireless stations. *Id.* at 1. Plaintiff argues that the use of co-located term in certain cited prior art implies a different meaning as to the co-located term in the '100 patent. *Id.* at 3.

The primary issue is whether the term "co-located" require a component (*e.g.*, the router) to be at the same physical location as the station or can it be merely coupled or proximate to that station. For the reasons below, the Court rejects Plaintiff's arguments.

The disputed term is found in claim 15 of the ‘100 patent, which is reproduced below:

> A method of transmitting a wireless communication signal comprising:
>
> receiving a first RF signal at an antenna of a first remote wireless communication station;
>
> processing the first RF signal by a base station at the first remote wireless communication station;
>
> generating a second RF signal and a first transport signal representing a duplicate of the second RF signal at the first remote wireless communication station;
>
> transmitting the second RF signal from the antenna at the first remote wireless communication station;
>
> routing the first transport signal through a network of remote wireless communication stations to a second remote wireless communication station, **<u>each remote wireless communication station having a co-located, network layer router</u>**;
>
> transmitting a duplicate of the second RF signal based on the first transport signal from the antenna of the second remote wireless communication station;
>
> receiving a third RF signal at the first remote wireless communication station; and
>
> sending a second transport signal to a host unit based on the second RF signal.

(emphasis added). On its face, the claim language is simple. In performing the claimed method, a plurality of “remote wireless communication stations” is required, where each remote station has its own (1) “antenna” and (2) “network layer router” that is “co-located” with it. While the disputed term in its entirety is not found in other independent claims of the ‘100 patent, similar phrases are found in other claims, such as claims 1 and 19:

> [claim 1] “wherein each of the plurality of remote antenna units is coupled to a co-located, network layer router, and a first of the plurality of remote antenna units is coupled to a co-located remote base station”

> [claim 19] "a remote unit; a router co-located with and coupled to the remote unit; a baseband unit co-located with and coupled to the remote unit"

It is clear that the claims differentiate the terms "coupled" and "co-located." In other words, co-located means something different than just coupled.

The specification is consistent with the claim language. The only disclosed embodiments in the specification related to routing through a network of remote wireless communication stations is Figures 8 and 9. FIG. 8 is reproduced below:




Fig. 8

The specification teaches that each remote station has its own antenna and router:

> FIG. 8 illustrates one embodiment of a distributed base station system 800. System 800 has a central node 801 having an IP gateway and a plurality of remote wireless communication stations 802, 804, 806, 808, 810, 812. **Each remote station 802, 804, 806, 808, 810, 812 includes a remote unit 814, 816, 818, 820, 822, 824, an antenna 826, and a router 828.** In this embodiment, remote unit 818 and remote unit 820 are configured into a WiMax compatible base station. In another embodiment, all remote units 814, 816, 818, 820, 822, 824 are configured into PCS cellular base stations. Alternatively, any number of remote units 814, 816, 818, 820, 822, 824 could be configured into a base station for any of the technology or frequency bands described with respect to system 100. Each remote station 802,

> 804, 806, 808, 810, 812 functions similarly, except that they will vary based on the configuration of their respective remote unit 814, 816, 818, 820, 822, 824.

'100 patent, 9:2-18 (emphasis added). As a key advantage of the distributed base station system, because "[e]ach remote station 802, 804, 806, 808, 810, 812 includes a router, a best path is found [] from the origination remote station to the destination remote station." *Id.* at 9:43-46.

The prosecution history is relevant to this term. The Applicant amended its claims to include the "co-located" term – in addition to the previously recited "coupled" term – to distinguish the prior art, particularly the *Mani* prior art reference. *See* Defendant's Responsive Claim Construction Brief at 9-10; *see also* Exh. C (cited prosecution history) in Responsive Claim Construction Brief (Dkt. No. 54-3). In particular, in the Final Rejection dated September 8, 2010, the Examiner rejected Applicant's arguments of "Mani does not disclose a router at each of the plurality of remote antennas as claimed," as being "irrelevant since the claims in no way recite a router at each of the plurality of antennas, they simply recite that each antenna is coupled to a router." Dkt. No. 54-3 at 16-17. In response, the Applicant amended the claim by adding the "co-located" term and arguing that it distinguished the prior art of record because the *Mani* prior art "does not disclose a network layer router that is co-located at each of a plurality of remote antennas in a network as claimed." *Id.* at 32. The prosecution history confirms the Defendant's construction.

On balance, the Court rejects Plaintiff's arguments that the router only needs to be proximate to the wireless station. The claim language is clear that "co-located" means something different than just "coupled." This separate meaning is confirmed by the prosecution history. The plain meaning of the claim language requires that each remote wireless communication station has its own network layer router at that station. Overall, the specification confirms that the co-located

aspect of the claim requires a physical location of the network layer router. There is no support in the specification that co-located means merely coupled or being at a proximate distance to a station, or that a network layer router does not have to be at the same location as the wireless communication station. Nor does the prosecution history suggest a different meaning. At best, Plaintiff argues that the use of the "co-located" term in certain cited prior art implies a different meaning as to the co-located term in the '100 patent. The Court rejects that argument as being inconsistent with the teachings in the '100 patent itself.

The Court hereby construes the term "**each remote wireless communication station having a co-located network layer router**" in the '100 patent to mean "**each remote wireless communication station having a network layer router physically located at the station.**"

### B. "uplink RF sampled data"

| **Disputed Term** | **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
|---|---|---|
| "uplink RF sampled data"<br><br>('100 Patent, claim 19) | Plain and ordinary meaning. | Plain and ordinary meaning - "uplink data that has been converted from RF to digital" |

The parties dispute whether this term has its plain and ordinary meaning, and more particularly, dispute the plain and ordinary meaning of the term "sampled."

Plaintiff argues that the term should be given its plain and ordinary meaning. *See, e.g.*, Dkt. No. 48, Plaintiff's Opening Claim Construction Brief, at 7-8. Plaintiff argues that Defendant's construction contradicts the plain meaning of "sampling" and "digitization." *Id.* Plaintiff argues that there is no requirement in the claims or the specification that sampled uplink data must also be fully digitized. *Id.*

Defendant argues that its construction is consistent with the intrinsic record. *See, e.g.*, Dkt. No. 54, Defendant's Responsive Claim Construction Brief, at 12-16. Defendant argues that the only disclosure in the specification is "packetized" optical data, that is data that has been converted from RF to digital and then packetized. *Id.* at 14. Defendant also argues that the prosecution history confirms its construction that the data is digitized. *Id.* at 15-16.

In its Reply, Plaintiff argues that the specifications' use of "digital RF sampled data" is narrower than the claim's use of the term "uplink RF sampled data." *See, e.g.*, Dkt. No. 59, Plaintiff's Reply Claim Construction Brief, at 4-5. Plaintiff argues that Defendant's citation to the term "sampling" by extrinsic evidence is incorrect in that it does not consider the full process of analog to digital conversion. *Id.* Plaintiff also argues that the Defendant's construction is an impermissible limitation to the disclosed embodiment. *Id.* at 5-6. Plaintiff admits that fully digitized data has been sampled, but argues that nothing in the claims require that sampled data be fully digitized. *Id.*

The primary issue is whether "sampled" means fully digitized or partially digitized. For the reasons below, the Court finds that the term has its plain and ordinary meaning and simply means "uplink RF data that has been sampled."

The disputed term is found in claim 19 of the '100 patent, which is reproduced below:

> A remote wireless communication station for transmitting high speed wireless data comprising:
>
> a remote unit;
>
> a router co-located with and coupled to the remote unit;
>
> a baseband unit co-located with and coupled to the remote unit; and
>
> an antenna coupled to the remote unit;

> wherein the remote unit is configured to send **uplink RF sampled data** to a host unit based on RF signals received, and is configured to route data corresponding to RF signals transmitted and/or received over a network of remote units of which the remote unit is a member;
>
> wherein the baseband unit is configured to generate a first RF signal and a transport signal representing a duplicate of the first RF signal, wherein the remote unit is configured to:
>
> process the first RF signal to be transmitted from the antenna coupled to the remote unit; and
>
> send the transport signal over the network to be routed to a second of the remote units, such that a duplicate of the first RF signal can be transmitted from the second of the remote units.

(emphasis added). Nothing in the claims indicates a different meaning for "sampled" other than its plain and ordinary meaning.

The specification has numerous references to "RF data" and "digital sampled RF data." *See, e.g.*, '100 patent, 3:14-63; 6:2-24; 8:9-48; *see also* FIGs. 1 and 4. Nothing in the specification indicates a different meaning for "sampled" other than its plain and ordinary meaning. The prosecution history is not particularly helpful for this term.

Plaintiff relies on a technical definition for the term digital processing. In particular, "[d]igitization involves two processes: sampling (digitization in time) and quantization (digitization in amplitude). This whole process is called analog-to-digital (A/D) conversion." *See* Exh. 3 to Plaintiff's Opening Brief (Dkt. No. 48-4). Likewise, Defendant relies on technical definitions for its construction. In particular, "sampling" is the "process of converting an analog signal into a series of digital values." *See* Exh. D to Defendant's Responsive Brief (Dkt. No. 54-4). There seems to be no dispute between the parties that sampling is generally known as the process of converting an analog signal to a digital signal.

On its face, the claim language is clear. The remote unit is configured to send uplink RF sampled data to a host unit based on RF signals received by the remote unit. The dispute between the parties is focused on the "sampled" term. There is nothing in the intrinsic record that suggests the term "sampled" means anything other than its plain and ordinary meaning as understood by a person of ordinary skill in the art. The Court finds that there is no lexicography, disavowal or disclaimer in the specification to require any particular limitation to this plain and ordinary meaning of the term. Indeed, both parties rely on extrinsic evidence in support of their plain meaning construction. Accordingly, the Court finds that one of ordinary skill in the art, based upon the specification and the claims, would understand the disputed term to have its plain and ordinary meaning.

Plaintiff contends that sampled can mean only partial digitization, while Defendant argues that it requires full digitization. Based on the record, the Court is not convinced by Defendant's arguments. The Court finds no requirement in the claims or the specification that sampled uplink data must also be fully digitized as opposed to partially digitized. The extrinsic evidence relied upon by Plaintiff suggests that data can be sampled but not fully digitized. While fully digitized data *has been* sampled, nothing in the claims requires that sampled data necessarily be *fully* digitized. Consistent with the term's plain and ordinary meaning, the Court is not convinced that sampled, in this context, requires full digitization. The Court finds that whether uplink RF data has been sampled or not, according to the plain meaning of the term, must be resolved by the fact finder.

The Court hereby construes the term "**uplink RF sampled data**" in the '100 patent to mean "**uplink RF data that has been sampled.**"

## V. CONCLUSION

The Court adopts the above constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 15th day of May, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE