IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PROCOMM INTERNATIONAL PTE. LTD., <br> *Plaintiff*, <br> v. <br> VERIZON COMMUNICATIONS, INC., CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS, TELEFONAKTIEBOLAGET LM ERICSSON, *and* ERICSSON, INC., <br> *Defendants*. | § § § § § § § § § § § § § § CASE NO. 2:24-CV-00009-RWS-RSP |

## **MEMORANDUM ORDER**

Before the Court is Defendants' Motion to Strike Certain Testimony of Plaintiff's Technical Expert Dr. Murat Eron. **Dkt. No. 101**. The motion is fully briefed. *See* Dkt. Nos. 115, 123, 135. For the reasons set forth below, the Motion is **DENIED**.

### I.    LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires trial courts to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied regarding a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert*, 509 U.S. at 592–93 (1993). Such courts are given broad discretion in making Rule 702 admissibility determinations. *Kumho Tire*, 526 U.S. at 152 ("a judge must have considerable leeway in deciding

in a particular case how to go about determining whether particular expert's testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. See *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury to consider. See *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("'The trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits" (quoting an Advisory Committee Note to Fed. R. Evid. 702)). As the Supreme Court explained, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." See *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

Despite the above, however, "even if testimony is reliable, it may still be excluded if it relies on information that violates the rules [of Civil Procedure]." *Estech Sys. IP, LLC v. Carvana LLC*, 2023 WL 3292881, at *2 (E.D. Tex. May 5, 2023).

## II. DISCUSSION

A. <u>Cost Savings Analysis & Rebuttal Non-Infringing Alternatives Opinions</u>

    *i. Allegedly "Unacceptable" Alternatives*

Defendants first move to strike portions of Dr. Eron's report that discuss two alleged alternatives. Dkt. No. 101 at 1–3. Relying on *Longhorn HD LLC v. NetScout Sys., Inc.*, No. 2:20-cv-349, 2022 WL 991696, at *4 (E.D. Tex. Mar. 31, 2022), and *CLO Virtual Fashion Inc. v. Zhejiang Lingdi Digital Tech. Co.*, No. 2:23-cv-724, 2025 WL 1900674, at *6 (E.D. Tex. July 9, 2025), Defendants argue alternatives must be "both available and acceptable." *Id.* at 1.

Having already identified problems with Defendants' non-infringing alternatives in a prior section of his report, Dr. Eron first explains in a new section, entitled "Analysis of Cost Savings" that he is "not aware of any available, acceptable non-infringing alternatives." Dkt. No. 101-3 ¶ 143. For both sets of accused products (mmWave and mid-band), Dr. Eron opines that he "considered the next best alternatives of deploying a two-box system that separates the antenna array from the RF electronics," with either "cable runs" or "very short cable runs" "in between," the two boxes, and, for the mid-band products, "a tower mount multiple LNA box to boost received signals." *Id.* ¶¶ 145, 147. Dr. Eron then calculates what he describes to be the "cost savings" for each product over its two-box alternative and summarizes these in two tables. *Id.* ¶¶ 146, 148.

Some context for how this cost savings analysis factors into the damages analysis is helpful. The cost approach, which considers cost savings, is one of three approaches Plaintiff's damages expert, Mr. Justin R. Blok, considers. Dkt. No. 99-1 ¶¶ 57, 61. He then goes on to opine that "the hypothetical negotiation would have principally focused on the *cost savings* realized by Defendants from implementing the teachings of the '813 Patent *over the next best alternative*." *Id.* ¶ 145 (emphasis added). Mr. Blok then reproduces Dr. Eron's cost savings tables. *Id.* ¶¶ 145–46, 162. Based on these tables, *inter alia*, Mr. Blok opines that "the incremental benefit provided by

3

the teachings of the '813 Patent is at least" the cost savings amounts calculated by Dr. Eron. *Id.* ¶ 164. He then multiplies the incremental benefit by a "split rate" that the parties would allegedly have agreed to, resulting in a reasonable royalty rate *amount* per product. *Id.* ¶ 172. He multiplies this rate per product by the number of products sold during the infringement period, resulting in a reasonable royalty total for the '813 Patent. *Id.* ¶¶ 177–78.

Going back to Defendants' argument about Dr. Eron's reported alternatives, Defendants focus on a few of Dr. Eron's statements about the alternatives: specifically, that they (1) "do not provide the same *features and benefits* of the Asserted Claims of the '813 Patent," Dkt. No. 101-3 ¶ 144 (emphasis added), (2) "would not offer even close to the original *performance* of the products" "no matter what additional components were added to the system" and "beyond a certain point, *adding [] cables* . . . would not be *feasible*," *id.* ¶ 152 (emphasis added), (3) "do not *fully substitute* for the Accused Products and/or why *some customers might not find* the next best alternative *commercially acceptable*," Dkt. No. 101-5 ¶ 345 (emphasis added), and (4) "it is not clear that such alternatives would be *commercially* acceptable, as it would require more pole space and have worse performance," *id.* ¶ 356 (emphasis added). *See* Dkt. No. 101 at 2–3. Defendants then argue that Dr. Eron's alternatives to the '813 Patent should be excluded because he opines that they are not acceptable. *Id.* at 3 (relying again on *Longhorn* and *CLO*). Again, as Defendants argue, cost savings analysis requires that the alternatives be non-infringing alternatives, which additionally requires that these alternatives be both available and acceptable, and Dr. Eron has opined, at least, that some of his alternatives are not "commercially acceptable." *Id.* at 3.

The Court finds that this argument does not render Dr. Eron's opinions insufficiently reliable. Defendants make an argument that an alternative cannot be used "as both a sword and a shield," whereby a defendant would only be entitled to use an *acceptable* alternative (shield),

4

whereas a plaintiff could use an *unacceptable* one (sword). Dkt. No. 123 at 1–2. But Defendants miss the mark by forgetting the context of the hypothetical negotiation. Defendants are trying to drive down the price, while plaintiffs are trying to drive up the price. "Acceptable" is broad, but let us assume for the purposes of this example that it narrowly means "profitable" (as Dr. Eron means it here, Dkt. No. 101-5 ¶ 356). It then makes sense that a defendant would only point to an alternative to the patented invention that was *profitable* because if the alternative was *unprofitable* then the defendant could not make use of it in lieu of the patented invention, and it would be ineffective in driving down the negotiated royalty; it would be effective in driving up the royalty, however, if that were the only alternative. A savvy plaintiff would happily point to such an unprofitable alternative in trying to negotiate the best royalty. And that is exactly how Plaintiff's expert, Dr. Eron, uses the two-box alternatives he proposes here, to drive up the reasonable royalty rate. And that is completely consistent with the law. *See, e.g.*, *Grain Processing Corp. v. Am. Maize Prods. Co.*, 185 F.3d 1341, 1348 (Fed. Cir. 1999) (defining "acceptability" with respect to whether the alternative is "available or on the market at the time of infringement," not to commercial acceptability).

The Court therefore finds his analysis of alternatives to be sufficiently reliable to proceed to the jury's consideration, whether they credit it or not. Accordingly, the Court finds that the Motion should be and hereby is **DENIED** to the extent it seeks to strike Dr. Eron's opinions on his own proposed alternatives.

> ii. Allegedly Untimely Doctrine of Equivalents Argument Against Defendants' Non-Infringing Alternatives

Defendants' technical expert, Dr. Becker, proposed four potential non-infringing alternatives ("NIAs"), which would move various components (such as the mounting screws for the heatsink), but would otherwise remain one-box solutions. Dkt. No. 101-5 ¶ 346. Dr. Eron rebuts

5

these NIAs, *inter alia*, by arguing that they "would likely still infringe" the '813 and '521 Patents "at least under the doctrine of equivalents if not also literally." Id. ¶ 353; Dkt. No. 101-3 ¶¶ 124, 128, 131, 134, 135. Notably, the Court previously found that doctrine of equivalents (DOE) theories related to both patents were untimely, and denied Plaintiff leave to amend to add such theories to its case following claim construction. Dkt. No. 76 at 2–3.

Relying on this prior decision denying leave to amend Plaintiff's infringement contentions, Defendants first argue that the Court is compelled to decide that Dr. Eron similarly cannot offer DOE opinions rebutting Defendants' proposed NIAs under the law of the case doctrine. Dkt. No. 101 at 3–4 (citing *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1301 (Fed. Cir. 2012)). Plaintiff responds that the non-infringing alternatives were only proposed after the deadline for final infringement contentions, and its expert is entitled to respond to them. Dkt. No. 115 at 7.

One question before the Court is thus whether a plaintiff can respond to a NIA using a new theory not disclosed in infringement contentions. A second question raised is whether Dr. Eron puts forth a viable DOE argument. Under the narrow circumstances presented here, where Defendants put forth their NIAs after the deadline for amending contentions, the Court finds that Plaintiff is not untimely in relying on DOE in its expert's response, even where a broader reliance on DOE was disallowed earlier in the case. The Court also finds that Dr. Eron sufficiently developed his opinion on DOE given the very minor modification to the accused products proposed as the NIA.

Accordingly, the Court finds that that Defendants' Motion should be and hereby is **DENIED** to the extent of Dr. Eron's opinions stating that Defendants' proposed NIAs would "likely still infringe" "under" DOE.

B. <u>Allegedly Untimely Infringement Opinions</u>

    *iii. Dividing the First Airflow into Portions*

As discussed in the Court's Report and Recommendation on Defendants' noninfringement motions, claim 1 of the '521 Patent requires "drawing a first airflow across one or more convective openings of the heatsink, wherein the first airflow does not flow into one or more convective openings of the heatsink." '521 Patent at 8:4–7. In its infringement contentions, to satisfy this limitation, Plaintiff identified that the Accused Products "draw a first airflow across one or more convective openings of the heatsink *through the space between the rear panel and the heat sink assembly*, wherein the *first airflow does not flow into the* one or more convective openings of the *heatsink*," and produced several screenshots and other information allegedly evidencing this theory. Dkt. No. 101-6 at 17–23 (emphasis added).

Focusing on the very next statement in the contentions, that "the path . . . runs from the fan shroud into the chambers and across the heat sink fins," Dkt. No. 101 at 6, Defendants complain that Plaintiff's infringement contentions did not provide sufficient notice of Dr. Eron's theory that the airflow through the fans and into the rear panel is divided into "portions" wherein the first airflow portion does not flow into the convective openings of the heatsink, *id.* at 7–9. Defendants argue, therefore, that this theory is untimely. *Id.* at 8–9. Defendants also argue that Dr. Eron's "portions" opinions are unreliable and irrelevant because he improperly relies on separation of a unitary concept (airflow) to satisfy a negative "wherein" clause limitation. *Id.* at 7–8.

The Court disagrees on both accounts. Dr. Eron's infringement opinions separating the airflow into portions that do and do not flow into the heatsink was sufficiently disclosed as a theory in Plaintiff's infringement contentions. Defendants ignore a prior statement in the contentions, that a first airflow is drawn "through the space between the rear panel and the first heat sink assembly," where the "first airflow does not flow into the . . . heatsink." And to the extent that Defendants

7

argue what airflow cannot be separated into portions, the Court already rejected similar arguments in Defendants' motion for summary judgment of non-infringement of the '521 Patent, and is unprepared to find such opinions insufficiently reliable or irrelevant on this record.

Accordingly, the Court finds that Defendants' Motion should be and hereby is **DENIED** to the extent it seeks to strike as untimely or irrelevant Dr. Eron's opinions dividing the airflow into portions to satisfy the "drawing a first airflow" limitation of claim 1 of the '521 Patent.

    *iv. Additional Side Airflow*

Relatedly, but with respect to the SM 6701 product specifically, Defendants complain that images appearing in Dr. Eron's report showing additional side airflow "never appear in Plaintiff's Infringement Contentions and Plaintiff never alleged that there were discrete portions of the first airflow on the sides of the heatsink that were alleged to meet any aspect of Claim 14" of the '521 Patent. Dkt. No. 101 at 9–10. Defendants therefore argue that Dr. Eron's theory that "there are two airflows directed along the sides of the heatsink fins [in the SM 6701] that flow across convective openings . . . without flowing into [them]" is untimely and should be excluded. *Id.*

However, experts routinely add to their reports to support the theories that were timely disclosed in earlier contentions, and this type of addition is allowed by the rules. *See, e.g., GREE, Inc. v. Supercell Oy*, No. 2:19-CV-311, 2021 WL 518462, at *4 (E.D. Tex. Feb. 11, 2021) ("A plaintiff need only provide representative examples of the alleged infringement so as to give defendants fair notice of its infringement beyond that which is provided by the mere language of the patent claims themselves."). The Court finds that is exactly what has happened here with Dr. Eron's addition of the images. And to the extent that Defendants complain Dr. Eron's theory about separating the airflow is untimely, the Court rejects those arguments for the same reasons it rejected Defendants' arguments about the prior "portions" theory.

Accordingly, the Court finds that Defendants' Motion is **DENIED** to the extent it seeks to strike portions of Dr. Eron's opinions pertaining to the SM 6701 and the two allegedly infringing airflows directed along the sides of the heat sink fins that flow across the convective openings of the heatsink fins without flowing into them.

    v.   AIR 5322 Theories

Defendants once again raise a similar argument that Dr. Eron's opinions concerning the AIR 5322 that divide the airflow into portions to satisfy the negative "wherein" clause of the "drawing a first airflow" limitation are untimely as not disclosed in Plaintiff's infringement contentions. Dkt. No. 101 at 14. The Court has already rejected this argument with respect to Dr. Eron's opinions about all products, generally above, and reaffirms its reasoning here—that theory was sufficiently disclosed, including with respect to the AIR 5322.

Defendants raise two additional arguments, however. With respect to that same limitation, Dr. Eron essentially opines that the AIR 5322 infringes because, in addition to the airflow above the heatsink fins, airflow within the top portion of the heatsink fins does not count as flowing within the "convective openings" of the heatsink, because the convective openings only consist of the lower portions of the heatsink fins. Dkt. No. 101-4, app. A3 at 12–15. Defendants complain this theory about what constitutes a convective opening was not sufficiently disclosed in Plaintiff's infringement contentions. Dkt. No. 101 at 14. With respect to limitation 1[d], which requires "drawing a second airflow," Defendants complain that Plaintiff's infringement contentions did not disclose Dr. Eron's theory that the second airflow is drawn from the turbulent airflow within the AIR 5322 heatsink itself. *Id.* at 14–15.

The Court again finds that these infringement theories were sufficiently disclosed in Plaintiff's infringement contentions. As to the first complaint, in its infringement contentions, Plaintiff identified through an image that several zones of the AIR 5322 do not have airflow. Dkt.

9

No. 101-6 at 21. These are the same zones that Dr. Eron annotates in his report as being where the "convective openings" of the heatsink are. Dkt. No. 101-4, app. A3 at 12–15. As to the second, Defendants concede that the contentions identify "drawing a second airflow up from the heat sink fins," but argue that Dr. Eron's rejected this theory and put forth a new one in his deposition. Dkt. No. 101 at 14–15. The Court disagrees that Dr. Eron's deposition testimony is inconsistent with this theory. Dr. Eron and Plaintiff have been consistent throughout that the second airflow is drawn from within the heatsink. *See, e.g.*, Dkt. No. 101-7 at 191:21–193:25. These contentions were sufficient to put Defendants on notice.

Consequently, the Court finds that Defendants' Motion should be and hereby is **DENIED** to the extent it seeks to strike Dr. Eron's opinions that (1) a portion of the airflow constituting the first airflow does not flow into the convective openings of the AIR 5322 heatsink, (2) the convective openings constitute only some portion of the heatsink fins themselves, and (3) the "drawing a second airflow" limitation is satisfied by the drawing of turbulent airflow from within the heatsink.

### III.     CONCLUSION

For the reasons provided above, the Motion is **DENIED**.

**SIGNED this 9th day of February, 2026.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE